Slip Op. 10-75

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JTEKT CORPORATION and KOYO CORPORATION OF U.S.A.**, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES**, <br><br> Defendant, <br><br> and <br><br> **THE TIMKEN COMPANY**, <br><br> Defendant-Intervenor. | **Before: Timothy C. Stanceu, Judge** <br><br> **Consol. Court No. 08-00324** |

## OPINION

[Affirming final results of eighteenth administrative reviews of antidumping duty orders on ball bearings and parts thereof]

Dated: July 6, 2010

*Sidley Austin LLP* (*Neil R. Ellis* and *Jill Caiazzo*) for plaintiffs JTEKT Corporation and Koyo Corporation of U.S.A.

*Crowell & Moring, LLP* (*Daniel J. Cannistra* and *Alexander H. Schaefer*) for plaintiffs Aisin Seiki Company, Ltd. and Aisin Holdings America, Inc.

*Baker & McKenzie, LLP* (*Donald J. Unger*, *Diane A. MacDonald*, and *Joseph W. LaFramboise*) for plaintiffs American NTN Bearing Manufacturing Corp., NTN Bearing Corporation of America, NTN-Bower Corporation, NTN Corporation, NTN Driveshaft, Inc., and NTN-BCA Corporation.

*Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*L. Misha Preheim*); *Deborah R. King* and *Brian Soiset*, Office of Chief

Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Stewart and Stewart (*Geert M. De Prest*, *Lane S. Hurewitz*, *Terence P. Stewart*, and *William A. Fennell*) for defendant-intervenor.

Stanceu, Judge: JTEKT Corporation and Koyo Corporation of U.S.A. (collectively, "JTEKT") brought an action pursuant to 28 U.S.C. § 1581(c) (2006) to contest the final determination of the United States Department of Commerce ("Commerce" or the "Department") in the eighteenth administrative reviews ("AFBs 18 reviews" or "AFBs 18") of antidumping duty orders on ball bearings and parts thereof ("subject merchandise") from France, Germany, Italy, Japan, and the United Kingdom.  JTEKT Summons 1-2; *Ball Bearings & Parts Thereof From France, Germany, Italy, Japan, & the United Kingdom: Final Results of Antidumping Duty Admin. Reviews & Rescission of Reviews in Part*, 73 Fed. Reg. 52,823 (Sept. 11, 2008) ("*Final Results*"); *Issues & Decision Mem. for the Antidumping Duty Admin. Reviews of Ball Bearings & Parts Thereof from France, Germany, Italy, Japan, & the United Kingdom for the Period of Review May 1, 2006, through April 30, 2007*, at 2-3 (Sept. 11, 2008) ("*Decision Mem.*").  The reviews cover entries of subject merchandise made from May 1, 2006 through April 30, 2007 ("period of review" or "POR").  *Final Results*, 73 Fed. Reg. at 52,823.

The actions brought by plaintiffs American NTN Bearing Manufacturing Corp., NTN Bearing Corporation of America, NTN-Bower Corporation, NTN Corporation, NTN Driveshaft, Inc., and NTN-BCA Corporation (collectively, "NTN") and Aisin Seiki Company, Ltd. and Aisin Holdings America, Inc. (collectively, "Aisin") were consolidated under *JTEKT Corp. v. United States*, Consolidated Court No. 08-00324.  Before the court are JTEKT's and NTN's motions for judgment upon the agency record, which contest various determinations that Commerce made in

the Final Results.[1]  In two sections of Part II of this Opinion, the court addresses the claims of

JTEKT and NTN, as follows: (A) NTN's claim challenging the application of the Department's

"zeroing" methodology to non-dumped sales, and (B) various claims of JTEKT and NTN

directed to the Department's revised model match methodology, the adoption of which JTEKT

and NTN contest generally and the specific application of which each plaintiff challenges in

certain respects.  For the reasons discussed in this Opinion, the court concludes that the Final

Results are in accordance with law and must be affirmed.

## I. BACKGROUND

The court presents below the general background of the administrative and judicial

proceedings.  Additional background information specific to individual claims is presented in

Part II of this Opinion.

### A.  Administrative Proceedings

On May 15, 1989, Commerce issued antidumping duty orders on imports of ball bearings

from France, Germany, Italy, Japan, and the United Kingdom.[2]  On May 7, 2008, Commerce

---

[1] Pleading that as a non-selected respondent it received an average of the margins of JTEKT Corporation and Koyo Corporation of U.S.A. (collectively, "JTEKT") and American NTN Bearing Manufacturing Corp., NTN Bearing Corporation of America, NTN-Bower Corporation, NTN Corporation, NTN Driveshaft, Inc., and NTN-BCA Corporation (collectively, "NTN"), Aisin Seiki Company, Ltd. and Aisin Holdings America, Inc. (collectively, "Aisin") seeks relief in the form of a revised margin reflecting any changes to JTEKT's margin resulting from this litigation.  Aisin Compl. ¶¶ 5, 10-11; *see Ball Bearings & Parts Thereof From France, Germany, Italy, Japan, & the United Kingdom: Final Results of Antidumping Duty Admin. Reviews & Rescission of Reviews in Part*, 73 Fed. Reg. 52,823, 52,824-25 (Sept. 11, 2008) ("*Final Results*").  Aisin did not file its own motion for judgment upon the agency record.

[2] *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, Spherical Plain Bearings, & Parts Thereof From France*, 54 Fed. Reg. 20,902 (May 15, 1989); *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, & Spherical Plain Bearings & Parts*
(continued...)

issued the preliminary results of the eighteenth set of administrative reviews of these orders

("Preliminary Results").  *Ball Bearings & Parts Thereof from France, Germany, Italy, Japan, &*

*the United Kingdom: Prelim. Results of Antidumping Duty Admin. Reviews & Intent to Rescind*

*Reviews in Part*, 73 Fed. Reg. 25,654 (May 7, 2008) ("*Prelim. Results*").  Later that year,

Commerce issued the Final Results and incorporated by reference an internal issues and

decisions memorandum ("Decision Memorandum") containing the Department's analysis of

issues raised by interested parties subsequent to the Preliminary Results.  *Final Results*, 73 Fed.

Reg. at 52,824; *see Decision Mem*.  After the initiation of judicial review, the court granted

defendant's motion for leave to allow Commerce to amend the Final Results for correction of a

ministerial error.  Order 1, Nov. 25, 2008.  Commerce issued amended final results on

December 9, 2008.  *Notice of Am. Final Results of Antidumping Duty Admin. Reviews: Ball*

*Bearings & Parts Thereof from Japan*, 73 Fed. Reg. 74,703 (Dec. 9, 2008).

## B.  Judicial Review in the Consolidated Case

On October 10, 2008, the court granted Timken's consent motion to intervene on behalf

of the defendant.  Order 1, Oct. 10, 2008.  The court ordered consolidation under Consolidated

Court No. 08-00324 of *JTEKT Corp. v. United States*, Court No. 08-00324, *NTN Corp. v. United*

*States*, Court No. 08-00329, and *Aisin Seiki Co. v. United States*, Court No. 08-00370.  Order 1,

---

[2](...continued)
*Thereof From the Federal Republic of Germany*, 54 Fed. Reg. 20,900 (May 15, 1989);
*Antidumping Duty Orders: Ball Bearings & Cylindrical Roller Bearings, & Parts Thereof From*
*Italy*, 54 Fed. Reg. 20,903 (May 15, 1989); *Antidumping Duty Orders: Ball Bearings,*
*Cylindrical Roller Bearings, & Spherical Plain Bearings, & Parts Thereof From Japan*, 54 Fed.
Reg. 20,904 (May 15, 1989); *Antidumping Duty Orders & Amendments to the Final*
*Determinations of Sales at Less Than Fair Value: Ball Bearings, & Cylindrical Roller Bearings*
*& Parts Thereof From the United Kingdom*, 54 Fed. Reg. 20,910 (May 15, 1989).

Feb. 18, 2009.  JTEKT and NTN filed their motions for judgment upon the agency record in

April 2009.  Mem. of P. & A. in Supp. of Mot. of Pls. JTEKT Corp. & Koyo Corp. of U.S.A. for

J. on the Agency R. ("JTEKT Mem."); Mem. in Supp. of Mot. for J. on the Agency R. Submitted

on Behalf of Pls. NTN Corp., NTN Bearing Corp. of Am., Am. NTN Bearing Mfg. Corp., NTN-

BCA Corp., NTN-Bower Corp., & NTN Driveshaft, Inc. ("NTN Mem.").  Defendant and

defendant-intervenor oppose both motions in the entirety.  Def.'s Opp'n to Pls.' Mots. for J. upon

the Agency R. ("Def. Resp."); Resp. of The Timken Co. to the Rule 56.2 Mots. of JTEKT Corp.,

et al. ("Def.-Intervenor Resp.").  On December 10, 2009, the court held oral argument on the two

motions for judgment upon the agency record.

## II.  DISCUSSION

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c), which grants the Court

of International Trade exclusive jurisdiction of any civil action commenced under 19 U.S.C.

§ 1516a.  28 U.S.C. § 1581(c).  The court reviews the Final Results based on the agency record.

*See* 28 U.S.C. § 2640(b) (2006); 19 U.S.C. § 1516a(b)(1)(B)(i) (2006).  The court "shall hold

unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v.*

*NLRB*, 305 U.S. 197, 229 (1938).

JTEKT and NTN contest various determinations in the Final Results.  NTN challenges

the Department's zeroing procedure.[3]  NTN Mem. 5-10.  JTEKT and NTN challenge the

Department's decision to change its model match methodology, and each also challenges the

Department's rejection of suggested revisions to the new model match methodology.  JTEKT

Mem. 12-35; NTN Mem. 11-29.  In addition, JTEKT contests the Department's decision to base

its margin on specific model matches that JTEKT characterizes as inappropriate.  JTEKT

Mem. 35-39.

### A.  NTN's Claim Challenging the Department's Zeroing Procedure is Inconsistent with Controlling Judicial Precedent

NTN acknowledges the precedent upholding zeroing in administrative reviews but urges

the court to reconsider the issue because of decisions by the Appellate Body of the World Trade

Organization ("WTO"), which declared zeroing inconsistent with the WTO obligations of the

United States.  NTN Mem. 5.  Relying on announcements by the United States that it would

implement WTO decisions, NTN argues that the United States has done nothing to eliminate

zeroing in administrative reviews despite statements to the contrary.  *Id.* at 5, 9-10.

In litigation involving prior administrative reviews, the Court of Appeals for the Federal

Circuit ("Court of Appeals") rejected arguments essentially identical to those advanced by NTN

in this case, stating that "because Commerce's zeroing practice is in accordance with our well-

established precedent, until Commerce officially abandons the practice pursuant to the specified

statutory scheme, we affirm its continued use in this case."  *NSK Ltd. v. United States*,

---

[3] In its complaint, JTEKT challenged the zeroing methodology of the United States
Department of Commerce ("Commerce" or the "Department") and then abandoned the count in
its motion for judgment upon the agency record.   JTEKT Compl. ¶¶ 12-15; Mot. of Pls. JTEKT
Corp. & Koyo Corp. of U.S.A. for J. on the Agency R. 1.

510 F.3d 1375, 1380 (Fed. Cir. 2007).  The Court of Appeals rejected the argument that

Commerce was not free to apply zeroing in administrative reviews after ceasing to do so in

investigations.  *Id.* (citing *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1349 (Fed. Cir.

2005)).  In *Koyo Seiko Co. v. United States*, 551 F.3d 1286 (Fed. Cir. 2008) ("*Koyo III*"), the

Court of Appeals once again declined to hold zeroing impermissible or to remand the question to

Commerce for recalculation of dumping margins without the use of zeroing.  *Koyo III*, 551 F.3d

at 1291 (declining "to direct Commerce to reopen the Final Results . . . to consider the impact on

its decision of the subsequent WTO ruling").  As required by binding precedent, the court will

affirm the Department's use of zeroing in the Final Results.

### B.  The Department's Adoption and Application of the New Model Match Methodology Was In Accordance with Law

As a general matter, determining a dumping margin requires Commerce to compare the

export price (or constructed export price) for subject merchandise with the price of comparable

merchandise (the "foreign like product") in the home market.  19 U.S.C. § 1677b(a)(1)(B)

(2006).  For this comparison, Commerce first attempts to match sales of merchandise in the

United States with home-market sales of identical merchandise.  *Id.* § 1677(16)(A) (2006).  If

there is no identical merchandise, then Commerce attempts to match similar merchandise using

its model match methodology.  *Id.* § 1677(16)(B)-(C).

For the first fourteen sets of administrative reviews of ball bearing orders, Commerce

used a model match methodology that grouped bearings into "families" if the bearings matched

according to eight predetermined characteristics (the "family model match methodology").

*Issues & Decision Mem. for the Antidumping Duty Admin. Reviews of Ball Bearings & Parts*

*Thereof from France, Germany, Italy, Japan, Singapore, & the United Kingdom for the Period of*

*Review May 1, 2003, through April 30, 2004*, at 19-26 (Sept. 16, 2005) ("*AFBs 15 Decision*

*Mem.*").  In the fifteenth administrative reviews ("AFBs 15"), Commerce announced its new

model match methodology, which it applied in the sixteenth ("AFBs 16"), seventeenth

("AFBs 17"), and eighteenth administrative reviews.  *Decision Mem.* 3, 14.

      In the new model match methodology, Commerce matches ball bearing models that are

identical according to four physical characteristics: load direction, bearing design, number of

rows of rolling elements, and precision rating.  *AFBs 15 Decision Mem.* 19.  A match requires

consistency with respect to all four physical characteristics.  *Id.*  If there is such a match,

Commerce then examines four additional, quantitative characteristics: load rating, outer

diameter, inner diameter, and width.  *Id.*  Commerce selects the model with the lowest sum of the

deviations for these four quantitative characteristics and excludes potential matches if the sum of

the deviations exceeds 40%.  *Id.*  Finally, Commerce applies a difference-in-merchandise

("DIFMER") adjustment based on the difference in the variable costs of production for the two

models under comparison; however, Commerce excludes from consideration any potential

matches for which the DIFMER adjustment would be greater than 20%.  *Decision Mem.* 17-18.

      Plaintiffs raise various arguments in support of their claim that the Department's decision

to change the model match methodology was made unlawfully.  JTEKT Mem. 12-26; NTN

Mem. 11-15.  In addition, JTEKT argues that Commerce should change the 40% sum-of-the-

deviations cap, adopt lubrication as a physical characteristic, exclude allegedly inappropriate

matches from the dumping margin, and alter its process for evaluating inappropriate matches.

JTEKT Mem. 26-39.  NTN argues that Commerce should adopt model match subcategories for

the insert bearing design type and should use the DIFMER adjustment as a first step in resolving

ties when selecting the most similar merchandise.  NTN Mem. 15-20.

### 1.  Commerce Acted Lawfully in Adopting Its New Model Match Methodology

JTEKT and NTN challenge the Department's decision to depart from the previous, family

model match methodology.  Both argue that the Department's new methodology is unsupported

by substantial evidence on the record and that Commerce failed to demonstrate that the new

methodology is more accurate than the previous one.  JTEKT Mem. 14-24; NTN Mem. 11-15.

JTEKT argues that Commerce was incorrect in judging a methodology that generates more price-

to-price comparisons to be inherently more accurate than one limiting such comparisons.  JTEKT

Mem. 14-15.  According to JTEKT, increasing price-to-price comparisons does not achieve

greater accuracy and comes at the cost of comparing products that may differ by as much as 40%

in the aggregate with respect to four physical characteristics.  *Id.* at 15-16.  Similarly, NTN

argues that the new model match methodology is less accurate because less strict requirements

for matches result in matches with fewer similarities than the matches under the family model

match methodology.  NTN Mem. 14.  NTN also argues that the family methodology is entitled to

great weight because of its use in the first fourteen administrative reviews and because

Commerce stated its intent to continue using that methodology.  *Id.* at 11-12.  JTEKT adds that

Commerce deviated from its past practice in concluding that the new model match methodology

is more accurate.  JTEKT Mem. 17-20.

As the Court of Appeals has noted, "this statute 'is silent with respect to the methodology

that Commerce must use to match a U.S. product with a suitable home-market product.'"  *SKF*

*USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) ("*SKF II*") (quoting *Koyo Seiko*

*Co. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995) ("*Koyo II*")).  The Court of Appeals

viewed this silence as an indication that Congress afforded Commerce considerable discretion in

creating a methodology for identifying foreign like products.  *Id.* (citing *Pesquera Mares*

*Australes Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001) ("*Pesquera Mares*"),

which cites, in turn, *Koyo II*, 66 F.3d at 1209).  The Court of Appeals reasoned that, under

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), a court

must accept the Department's reasonable interpretation of a statute when the statute is silent

regarding a specific issue, even if the court would have preferred a different interpretation.

*SKF II*, 537 F.3d at 1379 (citing *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir.

1994) ("*Koyo I*")).  With respect to accuracy, the Court of Appeals concluded that "the

methodology yields more accurate results because it matches the most similar product rather than

merely pooling several models that matched as to eight characteristics but could vary

significantly in price or cost, due to differences in materials for certain components or added

features."  *Id.*  For these reasons, the Court of Appeals deferred to the Department's choice of

methodology as a reasonable construction of the antidumping statute.  *Id.* at 1380 ("Based on

Commerce's increased technological capacity, combined with its desire to fashion a model match

methodology more in keeping with its ordinary practice of selecting a single most similar model

rather than pooling values of product families, we affirm its decision to revise the model-match

methodology.").  In *Koyo III*, the Court of Appeals again affirmed the Department's use of the

new model match methodology.  *Koyo III*, 551 F.3d at 1290.

      The court concludes that Commerce acted lawfully in deciding to apply in AFBs 18 the

same basic model match methodology that it applied in the immediately-preceding sets of ball

bearing reviews and that has been upheld by the Court of Appeals.  As the Court of Appeals has

concluded on more than one occasion, Commerce's methodological choice is entitled to judicial

deference as a reasonable construction of the antidumping statute.  In deciding to apply the new

model match methodology in AFBs 18, Commerce relied on the same reasoning upon which it

made the initial decision to change its methodology in AFBs 15, which decision the Court of

Appeals repeatedly has affirmed.[4]  Plaintiffs point to nothing in the record of AFBs 18 upon

which the court could conclude that a different result should obtain in this case.

2.  Commerce Was Not Required to Adopt JTEKT's Proposal for 10% Deviation Caps in its
New Model Match Methodology

In applying the new model match methodology, Commerce considers four additional

physical characteristics after identifying, as potential matches, ball bearings that are identical to

the subject merchandise in bearing design, load direction, number of rows, and precision grade.

*AFBs 15 Decision Mem*. 19.  Commerce "select[s] the single model that has the fewest physical

differences from the U.S. model with respect to inner diameter, outer diameter, width, and load

---

[4] In AFBs 18, Commerce stated as follows:
As we explained in *AFBs 15*, we determined that compelling reasons existed to
revise the model-match methodology for these bearings proceedings.  Specifically,
we determined that a revision to the methodology would accomplish the following
objectives: 1) it reflects more accurately the intent of [19 U.S.C. § 1677(16)],
including the statute's preference for identifying the foreign like product by
selecting the single most-similar product; 2) it reflects the statutory preference for
using price-to-price comparisons; 3) it allows us to take advantage of technological
developments.  In addition, the revised methodology is much closer to our normal
matching practice than is the family-matching methodology.
*Issues & Decision Mem. for the Antidumping Duty Admin. Reviews of Ball Bearings & Parts
Thereof from France, Germany, Italy, Japan, & the United Kingdom for the Period of Review
May 1, 2006, through April 30, 2007*, at 14 (Sept. 11, 2008) (citations omitted) ("*Decision
Mem.*").

rating, with an upper boundary of a 40-percent difference in the total deviation in the values for

these four physical characteristics." *Id.* As discussed previously, Commerce declines to match a

home-market bearing to a U.S. bearing if the sum of the deviations from the U.S. bearing with

respect to the four measurable physical characteristics exceeds 40%. *Id.* JTEKT argues that

Commerce should have adopted JTEKT's proposal for individual caps of 10% as the maximum

permissible deviation for each of the four quantitative characteristics, as opposed to an overall

40% aggregate cap. JTEKT Mem. 27-30. According to JTEKT, any potential match that

deviates by more than 10% for one quantitative characteristic should be excluded, even if the

total deviation for all four of these characteristics is less than 40%. *Id.* Defendant responds that

Commerce appropriately rejected JTEKT's proposed change as unnecessary because the 40%

sum-of-the-deviations cap "compl[ies] with the statute and allow[s] for reasonable comparisons

of similar models" and "plaintiffs' proposed changes conflict with Commerce's court-approved

interpretation of the statute as applied in the model-match methodology." Def. Resp. 20.

JTEKT advances four arguments in support of its contention that Commerce should have

adopted its proposal for incorporating individual 10% deviation caps into the model match

methodology. JTEKT Mem. 27-30. Finding these arguments unconvincing for the reasons

discussed below, the court concludes that Commerce acted permissibly in rejecting JTEKT's

proposal.

JTEKT argues, first, that use of its suggested individual 10% deviation caps would

achieve greater accuracy even though yielding a greater number of price-to-constructed-value

comparisons. JTEKT Mem. 28. In the Decision Memorandum, Commerce disagreed with

JTEKT's conclusion as to accuracy, taking the position that use of constructed value rather than

the price-to-price matches preferred under the Act may decrease accuracy rather than improve it. *Decision Mem*. 23.

It is reasonable to assume that JTEKT's proposed 10% deviation caps would disqualify some matches that the single 40% sum-of-the-deviations cap would permit.  It does not follow that the overall accuracy attained by the model match methodology would be increased were JTEKT's 10% cap proposal adopted as a modification to that methodology.  As Commerce recognized when adopting the new methodology in AFBs 15, fewer matches means more resort to constructed value.  Constructed value also may involve some compromise of absolute accuracy in the determination of a dumping margin.  Commerce made the choice to adopt a 40% sum-of-the-deviations rule by balancing these competing considerations, and the court does not discern a basis upon which to conclude that Commerce chose unreasonably.  The mere fact that a home-market bearing differs by more than 10% in a measurable physical characteristic does not compel the conclusion that the resulting match is *per se* unreasonable; moreover, the DIFMER adjustment serves to compensate in part for physical differences in two matched bearing models.

Second, JTEKT argues that it presented evidence of individual, "distortive" mismatches resulting from the 40% sum-of-the-deviations cap but that Commere rejected that evidence for reasons not relating to the dissimilarity of models.  JTEKT Mem. 27-28.  Commerce found that JTEKT had not cited any matches that were inappropriate according to Commerce's normal practice and interpretation of 19 U.S.C. § 1677(16)(B).  *Decision Mem*. 23.  Defendant argues that JTEKT used criteria not considered in the new model match methodology to identify differences between matched bearings.  Def. Mem. 23.  In addition, defendant contends that the differences were not substantial enough to prevent reasonable comparison.  *Id.*

JTEKT's second argument is unpersuasive because the evidence JTEKT cites in its brief of what it terms "distortive" individual mismatches is grounded in differences exceeding 10% in measurable physical characteristics. *See* JTEKT Mem. 27-28. Again, the fact that a bearing differs by more than 10% in a single physical characteristic is not conclusive evidence of an unreasonable match.

Third, JTEKT argues that Commerce, in statements in previous administrative reviews, considered 10% as the proper amount of deviation for any individual dimensional characteristic. JTEKT Mem. 28-29, Ex. G (*Mem. from Acting Deputy Assistant Sec'y for Imp. Admin. to Acting Assistant Sec'y for Imp. Admin.* 13-15 (May 6, 2005)). Past proceedings and the administrative record refute this argument. Commerce chose to implement a methodology with a 40% sum-of-the-deviations cap for four dimensional characteristics, and the Court of Appeals upheld that methodology as reasonable. *See SKF II*, 537 F.3d at 1379. The court finds no evidence that Commerce previously intended to limit the deviation for each physical characteristic to 10%. Instead, Commerce treated its prior statement, not unreasonably, as merely an observation that an "average" deviation of 10% per variable was possible using the 40% sum-of-the-deviations cap. *Decision Mem.* 23-24.

Finally, JTEKT argues that its suggested 10% caps would add predictability and that the Court of Appeals "has recognized that one of the key goals in imposing an antidumping duty order is to encourage respondents to adjust their U.S. and comparison market prices in order to 'purge' themselves of dumping liability." JTEKT Mem. 30 (citing *Nucor Corp. v. United States*, 414 F.3d 1331, 1336 (Fed. Cir. 2005) ("*Nucor*")). Commerce agreed that JTEKT's proposal would make it easier for respondents to predict the universe of models in the comparison market

but "[did] not find this reason to be sufficient for [Commerce] to disregard price-to-price matches

that are appropriate and reasonable." *Decision Mem.* 24.

The court rejects the argument JTEKT makes regarding enhanced predictability. Even if

the individual 10% caps would enhance predictability of the methodology by limiting the

universe of total matches, that factor alone does not cause the court to conclude that Commerce

acted unreasonably in rejecting JTEKT's proposal. Commerce was permitted to consider, and

balance, competing objectives in adopting and, in the AFBs 18 review, applying, its model match

methodology, so long as it acted reasonably and within its statutory discretion in identifying the

foreign like product. The essential question is not whether Commerce was required to adopt a

proposed change because doing so would increase predictability but whether the methodology, as

actually applied, was reasonable absent any such change. The proposal for 10% caps, if adopted

by Commerce, could be expected to reduce the number of matches and thereby require more

applications of constructed value, a result that is not necessarily an improvement in overall

accuracy. In summary, the premise that the adoption of JTEKT's proposal would result in

increased predictability by limiting the universe of potential matches does not demonstrate that

Commerce acted unreasonably in rejecting that proposal. Moreover, the decision of the Court of

Appeals in *Nucor* did not address the specific issue presented by use of the model match

methodology in this case. *Nucor*, 414 F.3d at 1336 (upholding the decision by the Court of

International Trade that the United States International Trade Commission, in determining

whether the domestic industry was materially injured, reasonably interpreted statutory language

in according different weights to imports during different portions of the period of investigation).

3.  Commerce Lawfully Determined Not To Adopt Lubrication as a Ninth Physical Characteristic

        The model match methodology considers a total of eight physical characteristics.

*AFBs 15 Decision Mem.* 19.  JTEKT argues that Commerce should have adopted as a ninth

physical characteristic the presence or absence of lubrication, arguing that the differences

allowed in the new model match methodology amplify the need for this additional characteristic,

JTEKT Mem. 30-31, and that "[w]ithout the appropriate lubrication, a bearing model cannot

function properly in its designated application." *Id.* at 31.  JTEKT asks this court to remand the

Final Results so that Commerce may consider more thoroughly the merits of adding to the model

match methodolodgy the presence or absence of lubrication as an additional physical

characteristic.  *Id.* at 33.

        Defendant maintains that comparing lubricated and unlubricated bearings is reasonable

and in accordance with the Department's new model match methodology.  Def. Resp. 18.

Defendant argues that the application of a particular bearing is irrelevant to the model match

methodology and even to the prior family model-match methodology.  *Id.*  Defendant-intervenor

argues that Commerce does take lubrication into account because the cost of the lubricant affects

the variable cost of manufacturing considered by Commerce.  Def.-Intervenor Resp. 28.

        Upon considering JTEKT's proposal to add the presence of or absence of lubrication as a

physical model match characteristic, Commerce concluded during the review that JTEKT had

"not demonstrated that an unlubricated bearing cannot reasonably be compared with a lubricated

bearing." *Decision Mem.* 25.  Commerce considered the rolling element more relevant to the

similarity determination than substitutability for specific bearing applications.  *Id.* (citing

*Koyo II*, 66 F.3d at 1210 (stating that "for purposes of calculating antidumping duties, it is not

necessary 'to ensure that home market models are technically substitutable, purchased by the

same type of customers, or applied to the same end use as the U.S. model'" (quoting *Tapered*

*Roller Bearings, Finished & Unfinished, & Parts Thereof, From Japan; Final Results of*

*Antidumping Duty Admin. Review,* 56 Fed. Reg. 41,508, 41,511 (Aug. 21, 1991)))).  Commerce

stated that it has "never found that an unlubricated bearing could not be reasonably compared

with a lubricated bearing" and in the family model match methodology had treated as identical

two models of bearings that differed only in type of lubricant used.  *Id.*  Commerce explained

that it "only began treating such bearings as different products after [Commerce] found that

differences in lubricant can create significant differences in cost."  *Id.*

  The court concludes that the Department's decision not to adopt the presence or absence

of lubrication as an additional model match characteristic was reasonable and adequately

explained in the Decision Memorandum.  The statute, in 19 U.S.C. § 1677(16)(A), affords

discretion sufficiently broad to allow Commerce, in applying its established model match

methodology, to match a lubricated bearing with an unlubricated bearing, despite the fact that the

two bearings have different applications.[5]  *See Koyo II,* 66 F.3d at 1210; *Pesquera Mares,*

---

  [5] The statute provides:
   The term "foreign like product" means merchandise in the first of the
following categories in respect of which a determination for the purposes of part II
of this subtitle can be satisfactorily made:
   (A) The subject merchandise and other merchandise which is identical in
  physical characteristics with, and was produced in the same country by the
  same person as, that merchandise.
   (B) Merchandise
    (i) produced in the same country and by the same person as the subject
  merchandise,
    (ii) like that merchandise in component material or materials and in the
  purposes for which used, and

(continued...)

266 F.3d at 1384.  Where the difference with respect to lubrication and other physical differences

result in a significant difference in the variable costs of manufacturing, the potential match is

subject to the 20% DIFMER limitation and DIFMER adjustment.  The court lacks a basis on this

record to conclude that the absence of a model match characteristic specific to lubrication renders

unlawful the model match methodology when considered as a whole.

### 4.  JTEKT Has Not Demonstrated that Specific Matches Resulting from the Department's Methodology Are Contrary to Law

JTEKT argues that its dumping margin is based on inappropriate matches generated by

Commerce's model match methodology and therefore is unsupported by substantial record

evidence and not in accordance with law.  JTEKT Mem. 35-39.  In its brief, JTEKT describes

eighteen matches that it alleges were improper; for three of the matches JTEKT alleged that a

more appropriate match was available.  *Id.* at 35-36 (citing *id.*, Ex. C (*Letter from Sidley Austin*

*LLP to Sec'y of Commerce*, Exs. C-D (Nov. 19, 2007) ("*Nov. 2007 JTEKT Submission*")), Ex. E

(*Japan-Specific Case Br. of Respondents JTEKT Corp. & Koyo Corp. of U.S.A.* 13-17, Exs. 1-2

(June 17, 2008) ("*JTEKT Japan Case Br.*"))).

---

[5](...continued)
        (iii) approximately equal in commercial value to that merchandise.
  (C) Merchandise
      (i) produced in the same country and by the same person and of the
same general class or kind as the subject merchandise,
      (ii) like that merchandise in the purposes for which used, and
      (iii) which the administering authority determines may reasonably be
compared with that merchandise.
19 U.S.C. § 1677(16)(A)-(C) (2006).

During the review, Commerce rejected JTEKT's claim of mismatches, principally on the ground that the matches in question conformed to the model match methodology. The Decision Memorandum states:

> Each of the matches that JTEKT cited as inappropriate meet[s] the model-match criteria for these reviews. Namely, they are identical to the U.S. model with respect to bearing design, load direction, number of rows, and precision grade, they do not deviate by more than 40 percent in sum with respect to outer diameter, inner diameter, width, and load rating, and the difference in variable costs is less than 20 percent of the total cost of manufacturing the U.S. model.

*Decision Mem*. 17. Commerce also stated in the Decision Memorandum that "none of the characteristics which JTEKT cited to support its claims of matches of dissimilar products would have rendered such comparisons as inappropriate under the family-matching methodology because that methodology did not account for any of these characteristics." *Id.* With respect to JTEKT's three alternative matches, Commerce found that "the sum of the deviations of the 'inappropriate' model is smaller than the sum of the deviations of the 'more appropriate' model claimed by JTEKT." *Id.*

JTEKT does not contest Commerce's determination that the individual matches it challenges meet all criteria of the model match methodology. Rather, its claim is that Commerce must look beyond the model match methodology to consider claims that the methodology has produced matches of impermissibly dissimilar bearing models. JTEKT Mem. 36 (stating that "the Department is attempting to create a brightline rule whereby the matches generated by its new methodology cannot be challenged"). JTEKT advances several arguments in support of this claim.

JTEKT argues that Commerce's including the challenged matches in the calculation of JTEKT's margin was not supported by evidence on the record and that the only relevant record evidence shows that "the Department's new methodology results in comparisons of bearing models that have strikingly different features and uses, contrary to the statutory requirement that 'foreign like product' be merchandise 'like' the U.S. product "*in the purposes for which used*." JTEKT Mem. 38-39 (citing 19 U.S.C. § 1677(16)(B)(ii), (C)(ii)); *see* Reply Br. of Pls. JTEKT Corp. & Koyo Corp. of U.S.A. in Supp. of their Mot. for J. on the Agency R. 15 ("JTEKT Reply") (stating that "'the fact that these two models are matched under the sumdev methodology [*i.e.*, sum-of-the-deviations methodology] is simply a matter of coincidence of the sizes (physical characteristics) of the models and their relative costs of production, but it does not at all indicate that they are in any meaningful commercial or legal sense 'similar''" (quoting JTEKT Mem., Ex. E (*JTEKT Japan Case Br.* 15))).  According to JTEKT, "[t]he Department effectively ignored this statutory requirement when, in the [*Decision Mem.*], it stated that 'whether a specific application for one bearing differs from the specific application of another' is not 'dispositive.'" JTEKT Mem. 39 (quoting *Decision Mem.* 16).

The court rejects JTEKT's argument that the statute precludes the matching of ball bearings with different applications.  When read according to plain meaning, the statute allows Commerce more discretion than JTEKT's argument would acknowledge.  In requiring that the foreign like product be "*like* that merchandise in component material or materials and in the purposes for which used," 19 U.S.C. § 1677(16)(B)(ii) (emphasis added), Congress did not go so far as to require that the foreign like product and the subject merchandise be manufactured for, or

suitable for, the *identical* purpose or application.  *Id.* § 1677(16)(C)(ii).  Commerce concluded in

the Decision Memorandum that

> it is the rolling element that is dispositive as to whether a bearing can be
> considered similar with respect to the component material or materials and in the
> purposes for which bearings are used (*e.g.*, a ball bearing cannot be considered
> similar to a cylindrical roller bearing under any circumstance), not whether a
> specific application for one bearing differs from the specific application of
> another.

*Decision Mem.* 16.  In discussing the scope of the Department's discretion in identifying the

foreign like product in bearing cases, the Decision Memorandum correctly relies on *Koyo II* for

the principle that home market bearing models need not be "'technically substitutable, purchased

by the same type of customers, or applied to the same end use as the U.S. model.'"  *Id.* (quoting

*Koyo II*, 66 F.3d at 1210).

        The court also rejects JTEKT's argument that substantial evidence on the record of this

proceeding fails to support the eighteen individual matches JTEKT challenges as unlawful.

Although the home market bearings differ from the U.S. models in some physical way or with

respect to the individual application, substantial evidence exists on the record to support not only

the finding that the model match methodology was applied correctly as to each (a finding JTEKT

does not actually contest), but also to support a finding that each of the eighteen individual

matches was reasonable as an application of the discretion Commerce possesses in identifying

the foreign like product under 19 U.S.C. § 1677(16)(B)(ii) and (C)(ii).  The specific evidence to

which JTEKT directs the court's attention, which establishes that the home market bearings

Commerce selected differed from the U.S. bearings in identified physical respects or as to the

intended application, does not justify the rejection of those matches as impermissible exercises of

that statutory discretion on the record before the court.  Commerce's finding that the physical

differences and different applications did not rise to the level of rendering the matches

unreasonable is supported by substantial evidence on the record as a whole.  On the basis of that

record evidence, the court must sustain Commerce's decision not to make exceptions to the

results of the methodology as applied to the eighteen specific matches challenged by JTEKT.

JTEKT argues that the Court of International Trade has "previously recognized the

principle that the matches generated by the Department's model match methodology are not *per

se* appropriate."  JTEKT Mem. 36-37 (citing *NSK Ltd. v. United States*, 25 CIT 583, 601, 170 F.

Supp. 2d 1280, 1297-98 (2001) ("*NSK*")).  JTEKT submits that Commerce itself has recognized

this principle, stating in its brief that "[w]hen the Department adopted the new model match

methodology in the fifteenth review, the Department issued a [memorandum] expressing an

awareness that it may need to consider grossly inappropriate matches generated by the new

methodology on an 'item-by-item basis.'"  *Id.* at 9 (citing JTEKT Mem. Ex. F (*Mem. from Acting

Office Dir., AD/CVD Enforcement, to Deputy Assistant Sec'y for Imp. Admin., Group I*, at 7

(Jul. 7, 2004) ("*July 7, 2004 Mem.*")))  Because substantial evidence supports the factual

determinations underlying the eighteen matches JTEKT challenges, and because Commerce did

not exceed its statutory discretion in making those determinations, the court need not, and does

not, decide the question of whether Commerce is always free as a general matter to treat the

results of its model match methodology as *per se* appropriate, provided the model match criteria

are properly applied.  The court declines to speculate on whether, on some set of facts not

presented by this case, the methodology could produce a match that does not satisfy the

requirement of reasonableness.

Nevertheless, the court observes that JTEKT's "*per se*" argument reads too much into

*NSK*, which ordered a remand of a Commerce determination under the family model match

methodology to match a home market bearing with U.S. sales because Commerce "did not

indicate whether it made its determination under [19 U.S.C.] § 1677(16)(B) or (C))."  *NSK*,

25 CIT at 601, 170 F. Supp. 2d at 1297.  Nor does the Department's internal memorandum

support JTEKT's argument.  The discussion on which JTEKT relies pertained to a proposal

discussing a model match methodology different from the one Commerce eventually adopted;

that proposal rejected the idea of placing a cap on the sum of the deviations.  JTEKT Mem. Ex. F

(*July 7, 2004 Mem.* 7).  The discussion therein of possible resort to review of matches on an

"item-by-item basis" is presented as one of the reasons why a cap on the sum of the deviations

would not be needed.  *Id.*

<u>5.  JTEKT Is Not Entitled to a Remand Order Directing Commerce to Consider Modifying the
Procedure to Be Applied to Future Reviews</u>

In addition to challenging individual matches, JTEKT claims that "the Department should

adopt a process by which it can consider and reject individual inappropriate matches" resulting

from the model match methodology.  JTEKT Mem. 33.  Commerce rejected JTEKT's similar

comment during the review, stating in the Decision Memorandum that "JTEKT can and did

identify what it felt were inappropriate matches in its case brief" and that "there is nothing that

precludes any respondent from identifying allegedly 'inappropriate' matches in the future, either

in pre-preliminary comments or in case briefs as long as they rely on information on the record."

*Decision Mem.* 27.  Although rejecting JTEKT's proposed change in model match procedure,

Commerce also stated in the Decision Memorandum that "[n]evertheless, we intend to make

every effort to incorporate additional time in the process in subsequent reviews in order to

address JTEKT's concern." *Id.*

Unsatisfied with the answers Commerce provided in the Decision Memorandum, JTEKT

argues that

> [u]nder the current regulatory scheme (19 C.F.R. § 351.301(b)), the record in an
> administrative review of the order against ball bearings from Japan will always
> close long before publication of the preliminary results, which provides
> respondents with their first opportunity to analyze the specific model matches
> generated by the Department's new methodology.

JTEKT Mem. 33-34.  JTEKT submits that Commerce should allow a meaningful opportunity to

place on the record information supporting an objection to an individual match and that

otherwise a respondent must "front-load the administrative record with factual information about

bearing models that *might* be matched by the Department." *Id.* at 34.  JTEKT objects that in the

current review it was able to guess only some, and not all, of the inappropriate matches that

Commerce would make.  *Id.*  As relief on this claim, JTEKT seeks a remand

> for the Department to establish a procedure by which it will evaluate claims of
> inappropriate matches in future reviews, so that the parties may have (i) a clear
> understanding of the procedures governing this critical process; and (ii) a
> meaningful opportunity to submit evidence on the record demonstrating the
> inappropriateness of specific matches generated by the Department in its
> preliminary determinations.

*Id.* at 35.

Defendant responds that Commerce has used the same criteria for model matching for the

three prior administrative reviews, and that as a result JTEKT knew Commerce's model match

criteria before the preliminary results and before the 140-day deadline for information

submission.  Def. Mem. 26.  Defendant-intervenor argues that JTEKT introduced evidence

attempting to show that certain matches were inappropriate.  Def.-Intervenor Resp. 35-36.

        The question that is properly before the court is whether the Final Results and,

specifically, the procedure Commerce followed to allow JTEKT to contest individual matches

during the eighteenth reviews, were contrary to law.  Although JTEKT objects that in the current

review it was able to guess only some, and not all, of the matches that Commerce would make,

JTEKT Mem. 34, it did not support this objection by showing it actually was prejudiced by the

inability to submit additional information for the record on matches it contests as unreasonable.

JTEKT states that the record evidence regarding the eighteen alleged mismatches presented in

JTEKT's Japan-specific case brief of June 17, 2008 and in JTEKT's factual submission of

November 19, 2007 shows that Commerce compared "bearing models that have strikingly

different features and uses, contrary to the statutory requirement that 'foreign like product' be

merchandise 'like' the U.S. product '*in the purposes for which used*.'"  JTEKT Mem. 38-39

(quoting 19 U.S.C. § 1677(16)(B)(ii), (C)(ii)), Ex. C (*Nov. 2007 JTEKT Submission*), Ex. E

(*JTEKT Japan Case Br.*).  JTEKT argues that Commerce unlawfully disregarded this

requirement when Commerce stated that an application of a bearing is not dispositive as to

whether a match is appropriate.  *Id.* at 39.  However, the Court of Appeals has explained that "for

purposes of calculating antidumping duties, it is not necessary to ensure that home market

models are technically substitutable, purchased by the same type of customers, or applied to the

same end use as the U.S. model."  *Koyo II*, 66 F.3d at 1210 (internal quotation marks and citation

omitted).  Aside from the argument concerning different bearing applications, JTEKT's briefs in

support of its Rule 56.2 motion provide the court no description of what the additional

information would have been and why that information necessarily would have had significance

for the reasonableness determination on the specific matches at issue.  *See* JTEKT

Mem. 33-35, 38 (citing JTEKT Mem. Ex. C (*Nov. 2007 JTEKT Submission*), Ex. E (*JTEKT

Japan Case Br.*); JTEKT Reply 7-11.  The shortcoming in JTEKT's claim is not cured by

JTEKT's seeking relief in the form of a remand directing Commerce to consider changes to the

procedure for future reviews.  Having failed to show actual prejudice in the current review from

the inability to submit factual information after learning of Commerce's matches, JTEKT has not

established its right to obtain relief in the form of a remand ordering Commerce to consider

procedural changes for future reviews.  Therefore, the court does not decide the question of

whether Commerce, in future reviews, must allow respondents to submit information for the

record after announcing its matches.  Still, there can be no question that the change in procedure

JTEKT advocates would be advantageous from the standpoint of transparency and procedural

fairness.  Commerce appears to acknowledge as much in commenting that it will endeavor to

incorporate additional time in the process in future reviews.  *See Decision Mem.* 27 (stating that

"we intend to make every effort to incorporate additional time in the process in subsequent

reviews in order to address JTEKT's concern").

   6.  Commerce Did Not Err in Rejecting NTN's Proposal for Additional Bearing Design Types

     In the new model match methodology, Commerce first matches bearings according to

four physical characteristics, including bearing design type.  *AFBs 15 Decision Mem.* 19.  One of

the bearing design type categories recognized by Commerce is for "insert bearings."  *Id.*  During

the review, NTN proposed that Commerce subdivide the insert bearing design type category into

the following proposed subcategories: (1) insert bearing - set screw type; (2) insert bearing -

eccentric locking collar type; (3) insert bearing - adapter type; (4) insert bearing - farm

implement type; and (5) insert bearing - non-standard, other type.  NTN Mem. 15.  NTN argues

that Commerce did not provide detailed reasons explaining why NTN's proposed subcategories

did not segregate bearings with "different physical characteristics and practical applications."  *Id.*

at 16.  NTN argues that each of its proposed insert-bearing subcategories is unique and not

reasonably comparable to the others.  *Id.* at 15-20.

　　　　In the AFBs 18 reviews, Commerce considered, and rejected, NTN's suggested insert

bearing subcategories.  *Decision Mem.* 29-30.  Commerce first determined that "the different

types of insert bearings did not seem so different to us that they could not be reasonably

compared" and asked NTN for further justification in a supplemental questionnaire.  *Id.* at 29.

Commerce ultimately reached a finding, based on the record before it, that the prices and costs of

insert bearings with similar physical characteristics did not vary substantially according to the

different design types as proposed by NTN.  *Id.*  Commerce concluded that NTN had not shown

that other factors outweigh the price-and-cost similarity for determination of reasonable

comparison between products.  *Id.* at 29-30.  NTN responded that the different types of insert

bearings were considered commercially different by it, its customers, many manufacturers and

distributors, and international standards organizations.  *Id.* at 29.  NTN claimed that the limited

variance in costs and prices should not be dispositive in determining whether different bearings

could be reasonably compared.  *Id.*

　　　　The Court of Appeals in *Koyo III* confronted a similar issue when NTN previously

challenged the Department's refusal to accept NTN's proposals for "numerous" additional

bearing design types.  *Koyo III*, 551 F.3d at 1292.  Even though "NTN gave Commerce evidence

that NTN's design types were significantly different from each other," *id.*, the Court of Appeals

upheld the Department's rejection of the proposals, concluding that "NTN has not demonstrated

that Commerce's choice of design types . . . was unreasonable." *Id.*  The Court of Appeals added

that "NTN's claims that its design types are superior does not show that Commerce's use of its

own types was unreasonable." *Id.*

 The evidence of record supports Commerce's finding that the prices and costs of insert

bearings with similar physical characteristics did not vary substantially according to NTN's

proposed design types.  Although the record also would support findings that various types of

insert bearings are commercially recognized and have different applications, such other findings,

standing alone, do not support a conclusion that Commerce's decision to maintain a single insert

bearing design type was unreasonable.  As was appropriate, Commerce considered NTN's

proposal for insert bearing subcategories in the context of the entire model match methodology,

which matches bearing models after consideration of various parameters in addition to design

type.  Commerce's declining to adopt subcategories for insert bearings, when considered in that

context and according to the record evidence, did not cause that methodology to be unreasonable.

7.  Commerce Did Not Violate the Statute when Applying a Level of Trade and Contemporaneity
  Analysis before a DIFMER Analysis to Resolve Ties when Matching Merchandise

 In applying its model match methodology, Commerce first limits the pool of potential

matches to home market bearings that are identical to the U.S. model in bearing design, load

direction, number of rows, and precision grade.  *AFBs 15 Decision Mem.* 19.  Commerce then

selects, as the home market model most similar to the U.S. model, the home market model with

the smallest sum of the deviations from the U.S. model with respect to inner diameter, outer

diameter, width, and load rating, eliminating from consideration any potential match for which the sum of the deviations exceeds 40%.  *Id.*  As Commerce described the process, "[w]e then use differences in level of trade and contemporaneity to resolve ties between 'equally similar' home-market models as defined by our model match criteria."  *Id.*  Any remaining ties in possible matches are resolved by choosing the model with the smallest DIFMER adjustment.  *Id.*

NTN claims that it was impermissible for Commerce to apply its level of trade and contemporaneity analysis before using a DIFMER adjustment to resolve ties occurring during the selection of the most similar bearing model.  NTN Mem. 21-29.  NTN argues that Commerce "incorrectly elevated the factors of level of trade and contemporaneity, which are characteristics of a particular *sale* or sales, above the size of the difference-in-merchandise adjustment, which relates to the physical characteristics of a *bearing*, when determining the sale to choose in case of a tie between bearing models."  *Id.* at 22.  In NTN's view, because the DIFMER adjustment relates to physical characteristics, it must be considered before level of trade or contemporaneity of sales in the tie-breaking analysis.  *Id.* at 24-25.  "Because differences in physical characteristics and differences in cost take precedence in the statutory formulation of normal value, differences in cost should also take precedence in the Department's tiebreaking methodology."  *Id.* at 26.  According to NTN, "[i]t is impossible to choose one sale among alternative sales of the same product until the product itself is defined."  *Id.* at 27.

As NTN acknowledges, *id.*, the Court of International Trade has considered, and rejected, the argument it raises.  *Koyo Seiko Co., Ltd. v. United States*, 31 CIT 1512, 1525, 516 F. Supp. 2d 1323, 1338 (2007) ("*Koyo IV*")).  In *Koyo IV*, the court upheld the Department's use of the DIFMER adjustment *after* applying level of trade and or contemporaneity of sales in the tie-

breaking procedure.  *Id.* at 1525, 516 F. Supp. 2d at 1338.  NTN argues that the Court of

International Trade accepted flawed arguments in *Koyo IV*.  NTN Mem. 27.

Commerce stated in the Decision Memorandum its position that its applying level of

trade and contemporaneity before the DIFMER in the tie-breaking procedure comports with the

statute:

> Section 773(a)(1)(B)(i) of the Act [*i.e.*, 19 U.S.C. § 1677b(a)(1)(B)(i)] instructs us
> that the normal value shall be based on prices 'to the extent practicable, at the
> same level of trade' as the U.S. sale while section 773(a)(1)(A) of the Act [*i.e.*,
> 19 U.S.C. § 1677b(a)(1)(A)] instructs us that the normal value shall be based on
> prices 'at a time reasonably corresponding to the time' of the U.S. sale.

*Decision Mem.* 31.  In addition, Commerce stated that, because all potential matches within the

tie-breaking pool have passed the 20% DIFMER cap, the matches are approximately equal in

commercial value.  *Id.*

In *Koyo IV*, the Court of International Trade, citing specifically the definition of "foreign

like product" in 19 U.S.C. § 1677(16)(B), concluded that neither the statute nor Commerce's

regulations require Commerce to follow a specific hierarchy when determining similar

merchandise for comparison.  *Koyo IV*, 31 CIT at 1525, 516 F. Supp. 2d at 1338.  *Koyo IV*

concluded that "Commerce is left with broad discretion to develop its own methodology" for the

tie-breaking procedure.  *Id.* (citing *Torrington Co. v. United States*, 19 CIT 403, 414, 881 F.

Supp. 622, 635 (1995)).

Consistent with the analysis in *Koyo IV*, the court concludes that the antidumping law

does not require Commerce to elevate the DIFMER factor above the level of trade and

contemporaneity factors when conducting its tie-breaking procedure.  As *Koyo IV* recognizes, the

discretion Commerce may exercise in identifying the foreign like product extends to the decision

of how to break ties between multiple matches, all of which satisfy the model match criteria.

*Koyo IV*, 31 CIT at 1525, 516 F. Supp. 2d at 1338.  The proper inquiry is not whether NTN's

proposal is superior but whether the Department's determination is reasonable and in accordance

with the law.  As stated in *Koyo IV*, "[t]hough Commerce has in the past applied a DIFMER test

before applying a level of trade and contemporaneity test, it is nowhere required that it do so."

*Id.* (citing *CEMEX, S.A. v. United States*, 133 F.3d 897, 899-900 (Fed. Cir. 1998)).

 NTN's argument that, under the statute, it is impossible to choose one sale among

alternative sales of the same product until the product itself is defined, NTN Mem. 27, is also

unconvincing.  The DIFMER adjustment, although *related* to differences in physical

characteristics in that it is determined by the variable cost of manufacturing, is not itself a

physical characteristic.  Rather than constituting a procedure required by statute, the DIFMER

adjustment is a regulatory creation devised by Commerce to achieve more accurate comparisons

of sales by adjusting the price to reflect the difference in variable cost of manufacturing.  The

court does not find anything in the statute that precludes Commerce from using the DIFMER for

a second purpose, *i.e.*, as a means of choosing among matches that already satisfy the model

match criteria, only after considering level of trade and contemporaneity.

 In summary, Commerce did not act unreasonably or exceed its discretion in refusing to

adopt NTN's proposed change in the Department's tie-breaking procedure.

**Consol. Court No. 08-00324**                                                        **Page 32**

### III. CONCLUSION

For the reasons discussed in the foregoing, the court will deny the motions for judgment

upon the agency record of JTEKT and NTN and enter judgment accordingly.


                                                   /s/ Timothy C. Stanceu
                                                   Timothy C. Stanceu
                                                   Judge

Dated:  July 6, 2010
        New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

```
┌─────────────────────────────────────────┐
│ JTEKT CORPORATION and KOYO               │
│ CORPORATION OF U.S.A.,                   │
│                                          │
│                     Plaintiffs,          │
│                                          │
│         v.                               │
│                                          │
│ UNITED STATES,                           │
│                                          │
│                     Defendant,           │
│                                          │
│         and                              │
│                                          │
│ THE TIMKEN COMPANY,                      │
│                                          │
│                     Defendant-Intervenor.│
└─────────────────────────────────────────┘
```

**Before: Timothy C. Stanceu, Judge**

**Consol. Court No. 08-00324**

## JUDGMENT

Upon review of plaintiffs' complaints, plaintiffs' motions for judgment upon the agency record, defendant's and defendant-intervenor's responses thereto, and all other filings and proceedings herein, after due deliberation, and in conformity with the Opinion issued in this case, it is hereby

**ORDERED** that the Rule 56.2 motions for judgment upon the agency record of JTEKT Corporation and Koyo Corporation of U.S.A. (collectively, "JTEKT") and American NTN Bearing Manufacturing Corp., NTN Bearing Corporation of America, NTN-Bower Corporation, NTN Corporation, NTN Driveshaft, Inc., and NTN-BCA Corporation (collectively, "NTN"), be, and hereby are, DENIED; it is further

**ORDERED** that the entries at issue in this action and subject to *Ball Bearings & Parts Thereof From France, Germany, Italy, Japan, & the United Kingdom: Final Results of Antidumping Duty Administrative Reviews & Rescission of Reviews in Part*, 73 Fed. Reg. 52,823 (Sept. 11, 2008), be liquidated in accordance with the final court decision in this action; and it is further

**Consol. Court No. 08-00324**                                                    **Page 2**

      **ORDERED** that this action be, and hereby is, dismissed.


                                      /s/ Timothy C. Stanceu
                                      Timothy C. Stanceu
                                      Judge

Dated:  July 6, 2010
       New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                  Deputy Clerk